## LIFE INSURANCE COMPANY OF NORTH AMERICA, Plaintiff–Appellee,

v.

## Sandra VON VALTIER, Defendant–Appellant.

### No. 96–1947.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1996.

Decided June 19, 1997.

---

William E. Hoverson (argued), Modesto, Reynolds & McDermott, Chicago, IL, for plaintiff–appellee.

Anthony E. Blumberg (argued), Marshall Patner, Marshall Patner & Associates, Chicago, IL, for defendant–appellant.

Before CUMMINGS, COFFEY and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The unhappy facts of this case require us to decide whether the accidental death insurance policy from the Life Insurance Company of North America, the plaintiff in this declaratory judgment action, covers the self-inflicted death of Seymour O. Schlanger, who was a professor at Northwestern University. The district court granted summary judgment for Life Insurance, concluding that Sandra Von Valtier, Schlanger's former wife, had not brought forward competent evidence to show that the death was "accidental" within the meaning of the policy. Upon our independent review of the policy's language, we agree and therefore affirm the judgment of the district court.

For some time prior to his death, Schlanger was suffering both from alcoholism and severe depression. He was under the care of psychiatrist Dr. Bernard I. Lifson. Lifson prescribed Halcion for Schlanger's depression, notwithstanding the fact (according to the affidavit of Dr. Gerson Kaplan, a board-certified psychiatrist) that Halcion is contra-indicated for alcoholics. Alcohol, Dr. Kaplan stated, is a known depressant, and Halcion is a benzodiazepeme that is known to have ad-

verse side effects that might, when taken with alcohol, exacerbate the depressive effect of alcohol, cause a confused state of mind, or cause organic brain damage.

Professor Schlanger visited Dr. Lifson on June 19, 1990. Dr. Lifson prescribed Halcion for his depression, and Schlanger filled that prescription. About two weeks later, on June 30, 1990, Schlanger shot and killed himself. The Cook County Medical Examiner did not find evidence of Halcion in Schlanger's bloodstream, but pills were missing from the bottle of Halcion that Schlanger had obtained.

The insurance policy from Life Insurance that covered Northwestern's faculty members provided $250,000 in accidental death coverage on the following terms:

> We agree to pay benefits for loss from bodily injuries:
>
>> a) caused by an accident which happens while an insured is covered by this policy; and
>>
>> b) which, directly and from no other causes, results in a covered loss. (See the Description of Coverage.)
>
> We will not pay benefits if the loss was caused by:
>
>> a) sickness, disease, or bodily infirmity; or
>>
>> b) any of the Exclusions listed on page 2.

The exclusions to which the policy referred were (among others) losses resulting from "intentionally self-inflicted injuries, or any attempt thereat, while sane or insane," and "sickness, disease or bodily infirmity. (Bacterial infection resulting from an accidental cut or wound or accidental ingestion of a poisonous food substance are not excluded.)"

In September 1990, Von Valtier filed a claim under the policy. She asserted that Schlanger was a severely depressed alcoholic whose will was so impaired by the combination of alcohol and Halcion that he did not act intentionally when he killed himself. Her theory of intent had two aspects to it: first, that the drug combination so impaired his will that he did not appreciate the consequences of his actions, and second, that he did not realize how Halcion would interact with alcohol, and thus his ingestion of the Halcion itself was accidental. Life Insurance denied the claim on the ground that Schlanger's death was intentionally self-inflicted. It also argued that even if Dr. Lifson's alleged mistake in prescribing Halcion contributed to Schlanger's depressed state of mind, this was not an accident that "directly and from no other causes" resulted in Schlanger's death.

Two years later, Life Insurance filed this declaratory judgment action against Von Valtier seeking a judgment that (1) Schlanger died as a result of a self-inflicted injury, (2) his death was not an accident covered by the policy, and (3) his death was not a covered loss within the policy by virtue of the exclusion for intentionally self-inflicted injuries. Life Insurance, which asserted federal question jurisdiction because the accidental death policy was an employee benefit plan under ERISA (see 29 U.S.C. § 1001 *et seq.*), also asked for costs and fees and for any other appropriate relief. When Life Insurance moved for summary judgment, Von Valtier responded with the affidavit of Dr. Kaplan mentioned above. In addition to describing the dangerous interactions between alcohol and Halcion, Dr. Kaplan opined that Schlanger's death was foreseeable and preventable and resulted from "circumstances outside his control," namely, his doctor's failure to exercise acceptable standards of care in prescribing the Halcion.

Based on this evidence, the district court issued an order on December 27, 1995, granting summary judgment for Life Insurance. In its minute order, the court first noted that Von Valtier had not filed a Local Rule 12(N) statement in response to Life Insurance's Local Rule 12(M) statement asserting that the following critical facts were uncontested: "(1) the Deceased died as a result of a self-inflicted gunshot wound to his head; and (2) the policy at issue provides that no death benefits are payable when a loss is caused by an intentionally self-inflicted injury, while sane or insane." The court held that the lack of a Rule 12(N) statement meant that those two facts were admitted, citing *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir. 1992). Von Valtier had attached Dr. Kap-

lan's affidavit to her response—a move that did not comply with the Local Rules—but the court found that even considering his affidavit, Life Insurance was entitled to judgment. The existence of a contributing reason for Schlanger's actions, in the form of the drug interactions and the medical negligence that led to them, was not enough to raise the possibility that Schlanger's death was accidental or that he lacked the mental capacity to shoot himself intentionally. The court entered judgment for Life Insurance on December 28, 1995.

While the summary judgment motion was pending, Von Valtier obtained the transcript of Dr. Kaplan's November 1995 deposition. She moved on January 3, 1996, for leave to file it with the court, but her motion was dismissed as moot. She then filed a motion under Fed.R.Civ.P. 59(e) to alter· or amend the judgment. The file stamp on that motion indicated that it was received on January 18, 1996, which would have been six days too late as time is computed under Fed.R.Civ.P. 6(a), since January 12, 1996, was the tenth "day" after December 28, 1995, excluding weekends and legal holidays. In ruling on the motion to reconsider, the district court addressed the time question as follows:

> The court has no record that defendant filed this motion by January 12, 1996, and could deny the motion on the ground of untimeliness. However, the court will credit defendant's explanation for the filing date discrepancy, but nevertheless denies defendant's motion under both Rule 59(e) and Rule 60(b).

Looking at the merits of the motion, the court then took into account Dr. Kaplan's deposition testimony. It proved not to be completely helpful for Von Valtier. Life Insurance pointed out that Dr. Kaplan had admitted that the Cook County Medical Examiner had not found any Halcion in Schlanger's blood. Dr. Kaplan conceded that this meant that Schlanger had not taken a large dose of Halcion before his death, but he continued to think that Schlanger had taken some Halcion because of the missing pills. When asked whether Schlanger understood "that the bullet was going to enter his head," Dr. Kaplan responded affirmatively. He also explained that a person in Schlanger's mental frame of mind would have known that such a bullet would lead to his death, but that he would not comprehend death as such. This testimony did not raise a genuine issue of fact on whether Schlanger's will was impaired, and the court therefore denied the motion to reconsider.

When the appeal reached this court, we issued an order requiring the parties to brief the question whether the appeal from the underlying judgment (as opposed to from a de facto Fed.R.Civ.P. 60(b) ruling of the district court) was timely. Von Valtier responded with a memorandum explaining that Judge Gettleman had issued a standing order providing for filing in chambers, as permitted by Fed.R.Civ.P. 5(e), and that counsel had done so on January 12, 1996. Attached to the memorandum was a copy of the notice of motion and proof of service that had been served on Life Insurance, both of which showed the date of January 12, 1996. No document showed that the court received anything on January 12. On the basis of this showing, this court issued a briefing schedule on May 2, 1996, which allowed the case to proceed to oral argument.

■ The timely filing of a motion under Rule 59(e) (or another of the motions listed in Fed. R.App.P. 4(a)(4)) is a jurisdictional prerequisite to tolling the time to file a notice of appeal from a final judgment. See *Hope v. United States,* 43 F.3d 1140, 1142–43 (7th Cir.1994); *Green v. Bisby,* 869 F.2d 1070, 1072 (7th Cir.1989). Before reaching the merits of this appeal, we therefore must decide whether Von Valtier's motion was indeed filed within the time permitted by the rules. If the motion to reconsider was actually filed on January 18, 1996, then this court would have no jurisdiction to consider anything but whether the district court abused its discretion when it denied the motion, which could have been filed only under Rule 60(b). See *Kunik v. Racine County, Wis.,* 106 F.3d 168, 172–73 (7th Cir.1997), citing *Stone v. I.N.S.,* 514 U.S. 386, 402–04, 115 S.Ct. 1537, 1548, 131 L.Ed.2d 465 (1995). The record on this is scanty at best, but the only sensible way to interpret the district court's decision to "credit defendant's explanation

for the filing date discrepancy" is to read it as a finding that Von Valtier indeed filed her motion in chambers on January 12, but for some reason the judge did not "note thereon the filing date and forthwith transmit [the document] to the office of the clerk," as required by Rule 5(e). In other words, the judge found that Von Valtier's filing was timely and that it was his failure to act that caused the record to reflect a filing date of January 18, 1996, formally entered on the docket on January 19, 1996.

On that view of the record, this is not a case in which Von Valtier filed her motion jurisdictionally out of time, and we are therefore empowered to proceed to decide her appeal from the judgment against her on the merits. Before leaving this subject, however, we must express our disapproval of the district judge's handling of the postjudgment motion. It is important to recall that Rule 59(e) was amended in 1995 to change the trigger date from the date of service of a Rule 59(e) motion to the date of filing precisely because the Advisory Committee assumed that "[f]iling is an event that can be determined with certainty from court records." This will always be true when parties file their papers with the clerk of the court, which Rule 5(e) says "shall" be done unless the judge permits filing directly with the judge. In the latter event, as this case unfortunately illustrates, the system will break down unless the judge scrupulously follows the directions to note the date and transmit the documents immediately to the clerk. Less than perfect adherence to these instructions will mean that actual filing dates will become as uncertain as the former dates of service were, and something as important as the jurisdictional time limit for taking an appeal will once again be subject to factual disputes. Whatever system makes sense for routine documents used during the course of litigation before the district court, we think it far preferable for jurisdictionally critical motions like those under Rule 59(e) to be handled uniformly by the district courts through the office of the clerk, rather than risking everything on a judge-by-judge basis.

▮▮▮ This victory on jurisdiction is of little avail to Von Valtier, however, because on the merits, even on our *de novo* review of the summary judgment record, we find no error in the district court's disposition. First, as the court correctly noted, her failure to file a statement under Local Rule 12(N) would be reason enough to affirm the district court's decision. See *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994) (collecting cases). Second, Von Valtier did not in any event demonstrate a genuine issue of fact on the critical points. Since the insurance plan here is governed by ERISA, we rely on "the federal common law rules of contract interpretation." See *Cannon v. Wittek Cos., Int'l,* 60 F.3d 1282, 1284 (7th Cir.1995). We therefore "interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience," and "construe all plan ambiguities in favor of the insured." *Id.* Plan language may only be deemed ambiguous where "it is subject to more than one reasonable interpretation." *Id.* See also *McNeilly v. Bankers United Life Assurance Co.*, 999 F.2d 1199, 1201 (7th Cir.1993).

Here, it is clear that Schlanger inflicted the fatal wound on himself, and Von Valtier's own expert admitted that he did so realizing that the wound would lead to his death. The fact that he did not fully appreciate the meaning of death takes us more into the realm of the philosophical or religious than the legal; death has different connotations of finality for the devoutly faithful Christian, the Buddhist, and the atheist. The policy itself contemplated that someone might "intentionally" inflict injuries on himself while "insane." It therefore recognized that there are degrees of mental illness that do not totally deprive the person of the ability to direct his actions. At some point, a mental illness might become so severe that the person loses all semblance of an individual will (as the criminal law recognizes in the insanity defense, see 18 U.S.C. § 17 (outlining the insanity defense under federal law)), but the record here does not indicate that Schlanger was affected to this degree. (For a discussion of the role of the insanity defense in criminal law, see generally Jodie English, *The Light Between Twilight and Dusk: Federal Criminal Law and the Volitional Insanity Defense*, 40 Hastings L.J. 1 (1988) (explaining the costs associated with a narrow version of the insanity defense); Stephen J.

Morse, *Excusing the Crazy: The Insanity Defense Reconsidered*, 58 S. Cal. L.Rev. 777 (1985) (discussing the justifications for and the difficulties with the insanity defense).)

Von Valtier argues that this case should be governed by *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1097 (7th Cir.1994), in which we held that a self-inflicted injury was covered by the insurance policy at issue if the person attempting suicide "lacked the capacity for effective choice." In *Casey and in Reinking v. Philadelphia American Life Ins. Co.*, 910 F.2d 1210, 1214–16 (4th Cir.1990), on which *Casey* relied, the insurance policy in question did not have an exclusion for actions taken "while sane or insane." This means that those policies did not draw as fine a line among various possible mental states as this one did, and it was thus appropriate for those courts to construe the policies before them in a manner favorable to the insured. Here, we have no evidence that Schlanger totally lacked the capacity for effective choice. To the contrary, the only evidence indicates that he knew what he was doing at the critical moment and deliberately pulled the trigger. See *Arnold v. Metropolitan Life Ins. Co.*, 970 F.2d 360 (7th Cir.1992) (interpreting Illinois law and holding that death by Russian Roulette is foreseeable and thus not an accident). We therefore agree with the district court that the policy exclusion for "intentionally self-inflicted injuries ... while sane or insane" barred Von Valtier's claim.

Furthermore, Von Valtier's claim relies heavily on the factual assumption that Schlanger was indeed suffering from the interaction of Halcion with alcohol at the time he killed himself. Yet no evidence in the record directly supports that contention. The most reliable evidence comes from the Cook County Medical Examiner, who found that there was no Halcion in his system at the time of his death. Von Valtier did not introduce evidence about how quickly Halcion dissipates from the human body, or about the relationship between continuing mental effects of the drug and discernable physical traces. Her entire case rested on the fact that pills were missing from the bottle of Halcion found in Schlanger's home, but it is impossible to say whether he took those pills (if he took them at all) close enough to the time of his death for them to

have made a difference. This is too slender a reed on which to reach a jury. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (noting that the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment); *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 772 (7th Cir.1997) (same, citing *Anderson*). Moreover, in the absence of evidence showing that Halcion contributed to Schlanger's decision to kill himself, the question whether Dr. Lifson was negligent in prescribing Halcion becomes irrelevant.

We do not doubt that Professor Schlanger was a deeply disturbed man when he took his own life, nor is it unlikely that his alcoholism and his depression medications made matters worse rather than better. On this record, however, under the insurance policy Northwestern had with Life Insurance, Von Valtier is not entitled to benefits. The judgment of the district court is

AFFIRMED.