**Linda A. ANDRUS Plaintiff,**

**v.**

**AIG LIFE INSURANCE COMPANY, Defendant.**

**No. 3:03 CV 7659.**

United States District Court,
N.D. Ohio,
Western Division.

May 10, 2005.

Donald D. Simmons, Perrysburg, Max E. Rayle, Rayle, Matthews & Coon, Bowling Green, OH, for Linda Andrus, Plaintiff.

Christopher J. Van Blargan, Janik & Dorman, Matthew J. Grimm, Janik & Dorman, Stacy N. Lilly, Janik & Dorman, Steven G. Janik, Janik & Dorman, Cleveland, OH, for AIG Life Insurance Company, Defendant.

## ORDER

CARR, Chief Judge.

Plaintiff, a beneficiary of a life insurance plan provided by her late husband's employer, claims that the defendant, AIG Life Insurance Company (AIG), wrongfully denied her claim for accidental death benefits under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Plaintiff seeks review of that determination pursuant to 29 U.S.C. § 1132(a)(1)(B).

Pending is defendant's motion for summary judgment. Pursuant to *Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 619 (6th Cir.1998), this motion shall be converted from one for summary judgment to one for de novo review of the administrative record. For the following reasons, the defendant's motion shall be denied and defendant shall be ordered to pay plaintiff the proceeds of the insurance policy ($50,-000.00) forthwith.

### Background

On July 17, 1990, Thomas H. Andrus was employed by Champion Sparkplug in Toledo, Ohio, a division of Cooper Industries, Inc. (Cooper). He was enrolled in

Cooper's benefits plan, which included $50,000 accidental death and dismemberment (AD & D) insurance issued by AIG. Andrus designated his wife, Linda A. Andrus, as his beneficiary. On January 24, 2001, Andrus died. The Lucas County Coroner's report concluded that the cause of death was a combined drug overdose of prescription medication. The toxicology report revealed Andrus had toxic levels of Amitriptyline and Oxycodone in his blood. The coroner listed the manner of death as accidental.

On March 16, 2001, plaintiff submitted her proof of loss and requested payment of $50,000 under the plan and policy. On March 13, 2002, AIG denied the claim based on its finding that Andrus had suffered from drug addiction and drug dependency for years prior to his death.

Andrus had a severe back injury in 1983 at work. Andrus's primary care physician, John Meir, M.D., prescribed OxyContin for his back pain. After several months of taking OxyContin, Andrus complained that the effects of the drug dissipated within two hours. Dr. Meir and Andrus discussed the problems with continuing narcotic use for his back pain. Dr. Meir prescribed Demoral for breakthrough pain. Andrus and Dr. Meier had similar discussions during his June 9 and July 12, 1997, visits. Andrus refilled his OxyContin prescription for 360 thirty mg tablets on May 18, June 10, July 3, and July 28, 1997.

On August 18, 1997, Andrus complained to Dr. Meier that OxyContin was not relieving his pain. Dr. Meier, hoping to decrease Andrus's OxyContin use, then limited Andrus to sixteen tablets daily.

On September 8, 1997, Dr. Meier and Andrus discussed the use of Andrus's pain medication and the implications of such use. Andrus expressed eagerness to reduce the dosage of pain medication as soon as something definite could be done about his back injury.

On October 2, 1997, Dr. Meier once again discussed with Andrus his need to limit the level of OxyContin. Dr. Meier, however, gave Andrus refills, as well as a small prescription, for a couple of days because Andrus had used his previous month's supply early. Dr. Meier additionally cautioned Andrus against excessive future use of OxyContin. Andrus refilled his OxyContin prescription the following day.

On November 14, 1997, Dr. Meier had a long discussion with Andrus's wife about starting to wean Andrus off the narcotics and converting him to Darvon. Nonetheless, Dr. Meier refilled Andrus's OxyContin prescription and prescribed Darvon.

On December 19, 1997, Andrus went to the St. Charles Hospital emergency room to enter a detoxification program. Andrus was admitted and diagnosed as having chemical dependency, chronic back pain, and lethargy. On December 25, 1997, Andrus was discharged from St. Charles in improved and stable condition.

On January 8, 1998, Andrus had a post-detoxification appointment with Dr. Husain. At this time, Andrus reported that he had not craved OxyContin and that he felt well educated since going through detoxification.

On February 3, 1998, on referral by Dr. Husain, Andrus saw Dr. Daniel J. Kuna, a psychologist, to address his procrastination, introversion, impatience, frustration, and depression. Dr. Kuna's notes provide: "Major addiction ... close to death. 7 days hosp. Recovery now." Andrus treated with Dr. Kuna until May 14, 1998, two and one half years before his death. Dr. Kuna noted that Andrus was doing very well.

The counseling did not eliminate the medical need for pain medication. Andrus's physician continued to prescribe pain killers, increasing the OxyContin prescription in strength from forty mg to

eighty mg on October 26, 2000. Andrus's doctor issued refill orders for the prescription on January 2, 2001, and January 23, 2001, the day before his death.

## Standard of Review

■ In accordance with my December 1, 2004, Order, AIG's decision to deny plaintiff's claim for AD & D benefits is subject to de novo review. When applying a de novo standard of review, my role in reviewing a denial of benefits is to "determine whether the administrator made a correct decision." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir.2002) (citing *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990)). My review is limited to the evidence considered by AIG at the time of its final decision. *Id.*

Summary judgment is not the appropriate procedure in reviewing an ERISA action. *Wilkins*, 150 F.3d at 619. The steps I am required to take in adjudicating an ERISA action are:

1. As to the merits of the action, [I] should conduct a de novo review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. [I] may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but [I] may not admit or consider any evidence not presented to the administrator.

2. [I] may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or

alleged bias on its part. This also means that any prehearing discovery [if requested] at the district court level should be limited to such procedural challenges.

*Id.* Under a de novo review, my role is to determine whether the plan administrator was correct in denying the plaintiff benefits. *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir.1990).[1]

## Discussion

On March 13, 2002, AIG denied Mrs. Andrus's proof of loss claim. Mrs. Andrus subsequently filed this suit against AIG. AIG now moves for summary judgment[2] based on the following grounds: 1) to recover Andrus had to sustain "bodily injury caused by an accident;" 2) coverage is precluded by an "intentionally self-inflicted injury" exclusion; 3) Andrus did not sustain "bodily injury caused by an accident" that resulted directly and independently of all other causes; and 4) coverage is precluded by a "sickness, disease" exclusion.

### Claim 1: "Bodily injury caused by accident"

Coverage under AIG's policy is only available to Mrs. Andrus if her husband's death was caused by an accident. The policy does not define accident, but it excludes from coverage injuries that are intentionally self-inflicted and suicidal acts.

■ In an ERISA case, the term "accident" in an accidental death policy is analyzed under federal common law.

Under those federal common law rules we are to interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelli-

---

1. The Seventh Amendment to the Constitution does not guarantee the right to a jury trial in ERISA claim denial actions because a claim under ERISA for benefits denied is a claim that is equitable in nature. *Id.* at 616 (citing

*Bair v. General Motors Corp.*, 895 F.2d 1094, 1096 (6th Cir.1990)).

2. As noted *supra,* I will analyze this motion for summary judgment under the de novo ERISA review standard in *Wilkins.*

gence and experience, and construe all plan ambiguities in favor of the insured. Plan language may only be deemed ambiguous where "it is subject to more than one reasonable interpretation." *Santaella & Eldridge v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997) (holding that insured's death from prescription overdose was caused by an accident where the evidence indicated that the insured unintentionally ingested a fatal dose of codeine) (citations omitted).

In applying the federal common law rules of contract interpretation to an accidental death policy, the Seventh Circuit has held that the term "accidental" is commonly defined as "unexpected or unintentional." *Id.* at 462 (citing *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1097 (7th Cir. 1994)).

The Sixth Circuit, furthermore, has defined accident as a "'sudden event or change occurring without intent or volition though carelessness.'" *Chiera v. John Hancock Mutual Life Ins. Co.*, 3 Fed. Appx. 384, 391, 2001 WL 111585, *6 (6th Cir.2001) (quoting Webster's Third New International Dictionary 11 (1993)). Black's Law Dictionary defines accident as "an unintended and unforseen injurious occurrence; something that does not occur in the usual course of events or that could reasonably be anticipated." Black's Law Dictionary 15 (7th ed.1999). I find all three definitions persuasive as they conform to my understanding of the term "accident."

■ AIG claims that Andrus had become dependent on prescription medication for over three years before he died on January 24, 2001; therefore, AIG asserts Andrus's overdose was a conscious act rather than a mistake.

There is no dispute that Andrus ingested a lethal amount of prescription drugs that caused his death. There is no evidence in the record, however, that he knew it was a lethal amount. Nothing in the record reveals Andrus's expectation or intent in taking the overdose.

The record shows that Andrus had previously taken excessive amounts of Oxy-Contin without life-threatening consequences. There is no reason from the record to believe that he anticipated that death would occur on January 24, 2001, and there is no evidence on the record that shows Andrus intended to die. In fact, the coroner, determined that Andrus's death was an accident. *See Chiera*, at 3 Fed. Appx. 384, 391, 2001 WL 111585, *6 (relying in part on a coroner's determination as to the cause of death being an accident). It therefore cannot be said as a matter of law that Andrus's death was not due to an "accident" as defined by federal common law.

### Claim 2: "Intentionally self-inflicted injury"

AIG denied coverage to Mrs. Andrus because the policy does not provide for a loss that occurs in whole or in part by an intentionally self-inflicted injury. This exclusion holds that "any loss caused in whole or in part from, the following: Suicide or any attempt at suicide or intentionally self-inflicted injury or any attempt at intentionally self-inflicted injury" shall not be covered by the policy.

AIG relies on *Holsinger v. New England Mut. Life Ins.*, 765 F.Supp. 1279, 1282 (E.D.Mich.1991), where the court applied a four prong test to determine whether the plan language excluding coverage for, "intentionally self-inflicted injury," excluded a beneficiary who had taken drugs from coverage. The test asks:

First, was the ingestion of drugs intentional? Second, did the decedent know that the ingestion of drugs would be likely to cause an injury? Third, did the ingestion of drugs cause an injury? Fourth, did the loss result from the inju-

ry? If there is no genuine factual dispute as to any of these questions, summary judgment is appropriate.

*Id.*

The Court in *Holsinger* found that, "if the person ingesting the drugs has a general cognizance that the drugs could produce some injury, it is enough that there is some causal relation between the injury caused and the ultimate loss." *Id.*

AIG alleges that, due to Andrus's past experiences with OxyContin, including Dr. Meier's repeated warning and instruction not to take the OxyContin in excess of the recommended amount, Andrus had more than a "general cognizance" that injury was likely.

■ I disagree with the *Holsinger* court's understanding of what constitutes an "intentionally self-inflicted injury." First, *Holsinger* dealt with the non-therapeutic use of a drug. Andrus was prescribed OxyContin for back pain. Therefore, Andrus's use of OxyContin was therapeutic in nature. The intention to do something is "the willingness to bring about something planned or foreseen." Black's Law Dictionary 814 (7th ed.1999). Further, the common understanding of the definition of "intention" requires that the action be purposeful towards a goal. *See Sperle v. Mich. Dep't. of Corr.*, 297 F.3d 483, 496 (6th Cir.2002) (applying Michigan Law that an intentional act was a deliberate action in which a specific result was desired); In re *Markowitz*, 190 F.3d 455, 464 (6th Cir.1999) (defining an intentional tort as "those motivated by a desire to inflict injury or those substantially certain to result in injury"); *In re Wisner's Guardianship*, 148 Ohio St. 31,

35, 72 N.E.2d 751 (1947) (citing Webster's Dictionary saying that "intention" is "[a] determination to act in a certain way or to do a certain thing; purpose; design...."); 21 U.S.C. § 848(n)(1) (defining intent in the criminal arena). The *Holsinger* definition of "intent," therefore, is unpersuasive.

I agree that death can be a foreseeable consequence of overdosing on drugs, but many results are the foreseeable consequence of risky actions.[3] The issue with regard to Andrus's intent is not whether Andrus intentionally took the drugs or that he knew injury could occur, but rather if he took the drugs intending to kill or injure himself.

One cannot work backward from the outcome to the mental state: all that is certain is that Andrus's death resulted from a drug overdose. The overdose alone is not preponderant proof of intent.

The record does not support AIG's characterization of Andrus's ingestion of OxyContin as a purposeful infliction of injury on himself. There is no material dispute that Andrus took the drugs voluntarily: but nothing in the record indicates that he intended to take an overdose or that he intended to injure himself.

### Claim 3: Death Resulting Independently of All Other Causes[4]

AIG denied Mrs. Andrus coverage because Andrus's bodily injury did not result independently of all other causes. The policy provides, in pertinent part: "[i]njury wherever used in this policy means bodily injury caused by an accident occurring while this policy is in force as to the Insured Person and resulting directly and

---

3. For example, it is foreseeable that one will get into an automobile accident while operating a car; however, that does not mean that whenever one operates a car he intends to get into an accident. To say otherwise would eviscerate the insurance policy.

4. Defendant makes substantially the same arguments in Section 4 as in this section. The reasoning in Section 4 is pertinent to my analysis in this section. I analyze both, independently, because AIG denied benefits based on both clauses in the insurance policy.

independently of all other causes in loss covered by this policy."

■ A pre-existing disease or condition is an "other cause" when it "substantially contributes to injury or death." *Tolley v. Commercial Life Ins. Co.*, 14 F.3d 602, 1993 WL 524284, *3 (6th Cir.1993). In *Tolley,* the Sixth Circuit adopted the rationale set forth in *Adkins v. Reliance Std. Life Ins. Co.*, 917 F.2d 794, 797 (4th Cir. 1990), that a pre-existing infirmity or disease will preclude coverage where it "substantially contributed" to the loss.

■ It is undisputed that Andrus was addicted to prescribed medications at one point in his life, but it is unclear whether this pre-existing addiction substantially contributed to his death. Andrus became concerned in 1997 that the pain medications he was taking were becoming a problem, and he voluntarily sought professional assistance for such concerns on one occasion. After completing a course of hospitalization and counseling, he was never required to re-enter a treatment program. Andrus continued to take pain medications after that time, all of which were properly prescribed by a physician who had a complete and thorough grasp of his medication history.

The defendant has the burden of showing that its determination to deny benefits was supported by the evidence in the record. Defendant's briefs, however, are conclusory and lacking of any evidence showing that the record is clear that plaintiff's alleged addiction substantially contributed to his death. The record only indicates that Andrus was addicted to OxyContin at some point in time prior to his death, and that he died as a result of an OxyContin overdose. The record does not show how the two are causally related.

AIG is asking me to make a logical leap and rule, in essence, that because Andrus was, at one point, addicted to OxyContin, this prior addiction must have continued and substantially caused his death. However, the evidence in the record does not support this conclusion; the evidence in the record clearly shows that Andrus did not have any problems with addiction after he completed a detoxification program. It would be inappropriate to say, therefore, that a pre-existing disease or condition substantially contributed to Andrus's death.

Therefore, the evidence in the record is not sufficient for the defendant to conclude that Andrus's death resulted in whole or in part from a pre-existing infirmity.

### Claim 4: Sickness or Disease

■ AIG denied Mrs. Andrus coverage claiming that Andrus suffered from a sickness or disease. The policy provides, in pertinent part: "[t]he policy does not cover any loss caused in whole or in part by, or resulting in whole or in part from, the following: sickness, disease or infections of any kind."

The Eastern District of Michigan has held that drug dependency is recognized as a sickness or disease where the terms are not defined by the policy. *Klei v. Metro. Life Ins. Co.,* No. 91–CV–76942, 1992 WL 695749, *11 (E.D.Mich. Oct. 30, 1992); *see also Kitchen v. Time Ins. Co.,* 232 N.W.2d 863, 865 (Iowa 1975) (the otherwise defined term "sickness" includes alcoholism); *Hayden v. Guardian Life Ins. Co. of Am.,* 500 So.2d 831, 835 (La.Ct. App.1986) (holding that otherwise undefined term "sickness" includes chemical dependency); Diagnostic & Statistical Manual of Mental Disorders 191–212 (4th ed.2000).

In this case, Andrus became concerned in 1997 that the pain medications he was taking were becoming a problem, and he went to the St. Charles Hospital emergency room to enter a detoxification program. Andrus was admitted and diagnosed as having chemical dependency, chronic back pain, and lethargy. On December 25,

1997, Andrus was discharged from St. Charles in improved and stable condition. Andrus continued to take pain medications after that time, all of which were properly prescribed by a physician. On January 8, 1998, Andrus had a post-detoxification appointment with Dr. Husain. Andrus reported that he had not craved OxyContin, and that he felt "well educated" since he went through detoxification.

Further, assuming that Andrus was drug dependent, he was legally taking a controlled substance legally prescribed by a physician—he was "dependent" only to the extent that his doctor was prescribing the medicine. *See United States v. McIntosh*, 27 Fed.Appx. 537, 538, 2001 WL 1580238 (6th Cir.2001) (defendant was addicted to legal drug where physician did not prescribe drug and defendant procured it himself to satisfy his addiction). In fact, it is a violation of federal law to prescribe drugs to maintain someone's drug addiction. *Rivers v. Lawn*, 872 F.2d 1028, 1989 WL 34074 (6th Cir.1989).

There is no evidence that Andrus did anything illegal to obtain the drugs or, that after his successful detoxification, Andrus had any problems with drug dependency. Andrus should not be deemed to have the disease of drug addiction as his use of the OxyContin was encouraged by a licensed physician for pain management who had full knowledge of Andrus's past problems with drug addiction. Further, there is no evidence in the record that the physician was prescribing Andrus OxyContin to maintain Andrus's drug addiction.

There is insufficient evidence in the record to entitle the defendant to deny Mrs. Andrus coverage on the basis that Andrus's disease of addiction persisted past his detoxification.

### 5. Findings of Fact and Conclusions of Law

After reviewing the insurance policy and the record de novo, I find that there is insufficient evidence to warrant AIG's denial of plaintiff's benefits claim. Therefore, as a matter of law, I conclude that AIG denial of plaintiff's claim was improper and that, under the policy, AIG should have paid the plaintiff the benefits due to her.

### Conclusion

In light of the foregoing, it is

ORDERED THAT:

1. Defendant AIG Life Insurance Company's motion for summary judgment be, and the same hereby is denied;

2. Defendant AIG be, and the same hereby is ordered to pay plaintiff the proceeds of the insurance policy amounting to $50,000.00 forthwith.

3. A conference to determine whether there are any further issues for adjudication or if the case shall be closed is hereby set for Monday, May 23, 2005, at 11:45 a.m.. Out of town counsel may participate by telephone.

So Ordered.