F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**JUN 11 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAVIER AVALOS, SR., and ROSALBA
AVALOS-PORRAS, individually and as
next friends of their minor children Javier
Avalos, Jr. and Alejandro Avalos,

      Plaintiffs,

and

LIBERTY MUTUAL FIRE
INSURANCE COMPANY,

      Plaintiff - Intervenor - Appellant,

v.

EDMUNDO DURON, JR.; EDMUNDO
H. DURON, SR.; UNITED PARCEL
SERVICE,

      Defendants,

and

WILSHIRE INSURANCE COMPANY,

      Defendant - Appellee.

No. 00-2419

(D.C. No. CIV-97-521-JP)
(D. New Mexico)

**ORDER AND JUDGMENT**[*]

---

   [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before **BRISCOE**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

---

Liberty Mutual Fire Insurance Company (Liberty Mutual) appeals the district court's entry of summary judgment in favor of Wilshire Insurance Company (Wilshire). We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

On July 26, 1996, Rosalba Avalos-Porras was driving her van north on Interstate 25 in Sierra County, New Mexico. A tractor-trailer rig collided with the van, injuring Avalos-Porras and her passengers (her husband and two children). Avalos-Porras and her family filed the underlying diversity action against (1) Edmundo Duron, Sr., d/b/a ED Trucking (EDT), the owner of the tractor, (2) Edmundo Duron, Jr., the driver of the tractor, (3) United Parcel Service of America, Inc. (UPS), the owner of the trailer, and (4) Citywide Carriers (Citywide), the entity that arranged for EDT to haul the UPS trailer.

At the time of the accident, Citywide had a contract with UPS whereby Citywide agreed to "provide drivers with equipment for the movement of UPS cargo between UPS locations." App. at 157. Under the contract, UPS agreed to pay Citywide $1.10 per mile for its services. Citywide also had a "Common Carrier/Contract Agent Contract" with EDT. Id. at 165. The purpose of the EDT agreement was for EDT to transport UPS shipments for Citywide "in situations where Citywide did not have enough tractors or drivers of its own to transport all UPS . . . loads." Id. at 260. Under the agreement,

2

Citywide was required to offer to EDT "a minimum quantity of five (5) shipments per year," and EDT in turn was required "to transport those shipments tendered." Id. at 167. In exchange for EDT's services, Citywide agreed to pay EDT a "basic transportation rate" of "$.95/mile between all points in the continental United States." Id. As a result of these two contracts, EDT was transporting the UPS trailer involved in the accident.

Each of the three business entities named as defendants in the underlying action was covered by a commercial insurance policy at the time of the accident. EDT was covered by a policy issued through Progressive County Mutual Insurance Company (Progressive) that provided approximately $750,000 in liability coverage for EDT's tractor. Citywide was covered by a policy issued through Wilshire that provided $1,000,000 in liability coverage. UPS was covered by a policy issued through Liberty Mutual that provided $5,000,000 in liability coverage.

During the pendency of the underlying action, Liberty Mutual filed this action-in-intervention for declaratory judgment, naming Progressive and Wilshire as defendants. The purpose of Liberty Mutual's action-in-intervention was to obtain a determination of each insurance company's obligation, if any, to the plaintiffs in the underlying action for loss sustained in the accident. It was undisputed that Progressive, the company that provided liability coverage to EDT, owed the first level of coverage. Accordingly, Progressive tendered its policy limits, leaving the district court to decide what coverage, if any, was owed by Liberty Mutual and Wilshire.

Liberty Mutual filed a motion for summary judgment arguing that Wilshire owed the second level of coverage and that Liberty Mutual owed the third and final level of coverage. Wilshire filed a counter-motion for summary judgment arguing that it was not obligated to provide any coverage. The district court denied Liberty Mutual's motion and granted Wilshire's motion, concluding that EDT was an "insured" under the policy issued by Liberty Mutual to UPS, but was not an "insured" under the policy issued by Wilshire to Citywide.

## II.

Liberty Mutual contends the district court erred in concluding that EDT was not an "insured" under the policy issued by Wilshire to Citywide. We review the district court's ruling de novo. See Old Republic Ins. Co. v. Durango Air Serv., Inc., 283 F.3d 1222, 1225 (10th Cir. 2002) (applying de novo standard of review to district court's interpretation of insurance policies); VBF, Inc. v. Chubb Group of Ins. Co., 263 F.3d 1226, 1230 (10th Cir. 2001) (applying de novo standard of review to district court's summary judgment ruling).

To resolve this appeal, we begin by reviewing the relevant provisions of the Wilshire policy. The Wilshire policy defined "WHO IS INSURED" as follows:

1. You [Citywide] are an insured for any covered auto.
2. Anyone else is an insured while using with your permission a covered auto you own, hire or borrow . . . .
3. Anyone liable for the conduct of an insured described above is an insured but only to the extent of that liability. However, the owner or anyone else from whom you hire or borrow a covered auto is an

4

insured only if that auto is a trailer connected to a covered auto you own.

App. at 149. The Wilshire policy further defined the term "auto" to include "a land motor vehicle, trailer or semi-trailer designed for travel on public roads." Id. at 148.

Notwithstanding the above-quoted language of the policy referring to autos "own[ed], hire[d] or borrow[ed]" by Citywide, Citywide purchased coverage only for autos specifically described in a schedule attached to the policy. Id. at 143 (referring to the type of autos covered under the policy), 145 (describing the "COVERED AUTO DESIGNATION SYMBOLS" used in the policy), 147 (schedule of covered autos which lists only two items). Thus, Citywide did not purchase coverage for "hired autos." See id. at 146 (indicating that no "Hired Auto" coverage was purchased).

The Wilshire policy also included a Form MCS-90 endorsement mandated by the Interstate Commerce Commission (ICC) pursuant to 49 C.F.R. §§ 387.3(a) and 387.15. The MCS-90 "endorsement was required to ensure that all ICC-certified carriers maintain certain minimum coverage to protect the public in the event of accident or injury." Adams v. Royal Indem. Co., 99 F.3d 964, 966 (10th Cir. 1996). The MCS-90 endorsement read, in pertinent part, as follows:

> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer . . . agrees to pay, within the limits of liability described herein, any final judgment recovered against the ***insured*** for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 ***regardless of whether or not each motor vehicle is specifically described in the policy***

5

and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.  * * *  It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described . . . .  However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company.  The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

App. at 155 (emphasis added); see 49 C.F.R. § 387.15.  The endorsement defined the term "motor vehicle" as "a land vehicle, machine, truck, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof."  App. at 155.

It is undisputed that if we were applying the Wilshire policy without an MCS-90 endorsement, EDT would not be an "insured."  As set forth above, the terms of the policy define an "insured" in terms of specifically described vehicles.  Because the tractor owned and operated by EDT at the time of the accident was not a vehicle specifically described in the Wilshire policy, EDT itself was not an insured under the policy when read without the MCS-90 endorsement.

As the Wilshire policy had an MCS-90 endorsement, the question for us is whether the MCS-90 endorsement modifies the policy in such a manner as to result in EDT being

6

an "insured" for purposes of the accident at issue.[1]  In <u>Adams</u>, we addressed a

substantially similar insurance policy and described the effect of the MCS-90

endorsement on that policy:

> [T]he ICC endorsement does not explicitly define "insured," [but] indirectly modifies "insured" as defined in the basic policies by providing that the insurer must pay any final judgment against the insured for public liability resulting from operation of a regulated motor vehicle "regardless of whether or not each motor vehicle is specifically described in the policy." That is, this endorsement precludes a policy from limiting the *definition of an insured* to one who owns, hires or borrows only specifically described motor vehicles because such a limited definition would subvert the purpose of the ICC endorsement of requiring coverage on *all* regulated vehicles regardless of whether or not they are listed in the policy specifically.  A policy with this ICC endorsement cannot explicitly limit liability to those vehicles specifically described therein, nor can it indirectly so limit coverage by attempting to define who is insured in terms of specifically described vehicles.

99 F.3d at 970.  We therefore held in <u>Adams</u> that the MCS-90 endorsement "must be read

---

[1]  Some courts have held the MCS-90 endorsement is not triggered if there are no gaps in coverage, i.e., when there is no risk that the injured party will be unable to recover for injuries.  E.g., <u>T.H.E. Insurance Co. v. Larsen Intermodal Serv., Inc.</u>, 242 F.3d 667, 673 (5th Cir. 2001) (concluding that "when the protection of injured members of the public is not at stake, the MCS-90 and the relevant federal regulations do not address coverage for the purpose of disputes between the insured and the insurer"); <u>John Deere Ins. Co. v. Nueva</u>, 229 F.3d 853, 858 (9th Cir. 2000) (concluding "that the integral purpose of the MCS-90, to protect third party members of the public, is not implicated in a dispute between two insurers"), <u>cert. denied</u>, 122 S. Ct. 1063 (2002); <u>John Deere Ins. Co. v. Truckin' USA</u>, 122 F.3d 270, 275 (5th Cir. 1997) ("Where an insurance policy does not provide coverage for non-listed vehicles except to third-party members of the public through operation of the endorsement, the policy provides no coverage for purposes of disputes among insurers over ultimate liability.").  We find it unnecessary to reach this issue because we conclude that even if the MCS-90 endorsement was triggered in this situation, it did not result in EDT becoming an "insured" under the Wilshire policy.

7

to eliminate the limiting clause that coverage applie[d] only to covered autos described" in the policy, and thus effectively modified the policy to read: "'Anyone else is an insured while using with your permission an auto you own, hire or borrow.'" Id. at 971. Applying the same reasoning here, the Wilshire policy is effectively modified by the MCS-90 endorsement in the same manner. In other words, the Wilshire policy no longer defines an "insured" in terms of autos specifically listed in the schedule attached to the policy, but instead is modified to read: "Anyone else is an insured while using with your permission an auto you own, hire or borrow."

The more narrow question presented is whether, at the time of the accident, EDT was using with Citywide's permission an auto (i.e., the tractor involved in the accident) that Citywide had "hired" (since it is undisputed that the tractor involved in the accident was neither owned nor borrowed by Citywide). Because the Wilshire policy does not define the term "hire," the term must be "given [its] plain and ordinary meaning if that can reasonably be ascertained."[2] Grisham v. Allstate Ins. Co., 992 P.2d 891, 893 (N.M.

---

[2] Liberty Mutual argues that "the federal legislation which mandates inclusion of the MCS-90 endorsement in every insurance policy issued to a motor carrier itself sets forth a definition [of] 'for hire,'" Aplt. Br. at 15, but fails to cite any authority that would authorize us to interpret the Wilshire policy in light of that federal legislation. Even if we were to refer to the federal regulations cited by Liberty Mutual in its appellate brief, the result would be the same since those regulations define the phrase "[f]or hire carriage" as "the business of transporting, for compensation, the goods or property of another." 49 C.F.R. § 387.5.

8

Ct. App. 1999).[3] The Oxford English Dictionary defines the term in the following manner: "[t]o procure the temporary use of (any thing) for stipulated payment." Oxford English Dictionary (2d ed. 1989) (on-line version, http://dictionary.oed.com). Webster's similarly defines the term: "to engage the temporary use of for a fixed sum." Webster's Third New Int'l Dictionary 1072 (1993). Likewise, Black's Law Dictionary defines the term to mean: "[t]o purchase the temporary use of a thing." Black's Law Dictionary 729 (6th ed. 1990). Given the agreement of these sources, we conclude that the term "hire" is "capable of a plain and ordinary meaning." Grisham, 992 P.2d at 893.

Applying this plain and ordinary meaning to the circumstances here, we conclude that Citywide did not "hire" EDT's tractor. More specifically, Citywide did not procure, engage or purchase the temporary use of EDT's tractor. See Liberty Mut. Fire Ins. Co. v. Canal Ins. Co., 177 F.3d 326, 333-34 (5th Cir. 1999) (construing policy term "contract of hire" as referring to a contract or agreement relating to a particular vehicle, and not

---

[3] Although "[f]ederal law applies to the operation and effect of ICC-mandated endorsements," Harco Nat'l Ins. Co. v. Bobac Trucking, Inc., 107 F.3d 733, 735 (9th Cir. 1997), the term "hire" derives from the Wilshire policy and presumably must be construed in accordance with New Mexico law (i.e., the law of the forum state). See generally Cooper v. Central & Southwest Serv., 271 F.3d 1247, 1251 (10th Cir. 2001) (holding that, in diversity action, court must ascertain and apply the law of the forum state). Even if federal law were controlling as to the meaning of the term "hire," it appears to be consistent with New Mexico law and would produce the same result. E.g., Santaella v. Metropolitan Life Ins. Co., 123 F.3d 456, 461 (7th Cir. 1997) (holding that, under federal common law, the terms of an insurance policy must be interpreted "in an ordinary and popular sense, as would a person of average intelligence and experience") (internal quotations omitted).

including contract for performance of a specific service which encompassed the use of such a vehicle).  Rather, Citywide effectively subcontracted with EDT to perform work that it had contracted with UPS to perform.  In other words, Citywide engaged EDT to perform a service, i.e., "the transportation of the commodities" from one location to another.  App. at 167 (quoting from terms of contract between Citywide and EDT).  Significantly, Citywide had no right under its contract with EDT to specify the use of a particular vehicle, nor did it have the right to specify a particular driver or route (even though the start and destination were obviously controlled by UPS).  In fulfilling its contractual obligation to Citywide, EDT had complete control over the vehicle, driver, and route chosen to complete the task.  Moreover, EDT had the right under the contract to "decline any load with or without giving reason to" Citywide.  Id. at 166.  Thus, the EDT tractor was not "hired" by Citywide (and, in turn, EDT did not need or receive "permission" from Citywide to use the tractor).

We conclude the district court properly granted summary judgment in favor of Wilshire and against Liberty Mutual.  The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge
